# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VICTAULIC COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 21-5077 |
| | : | |
| HiTherm, LLC *et al.*, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

**SCHMEHL, J. /s/ <u>JLS</u>**                                        **April 4, 2024**

This case arises from a product development agreement and potential acquisition between parties whose relationship eventually soured, leading to disputes about the ownership of intellectual property, funds advanced to Defendants, and Plaintiff's obligation to purchase Defendants' assets, among other issues. Now before the Court are the parties' dueling Motions for Summary Judgment (ECF Nos. 136, 138). For the following reasons, the Motions are granted in part and denied in part.

## I.    BACKGROUND

Plaintiff Victaulic, an Easton, Pennsylvania company, is in the pipe industry, where it "develops and manufactures mechanical pipe joining methods, flow control, and fire protection systems, among other things." (Joint Statement of Undisputed Material Facts ("JSUMF") ¶¶ 1–2, ECF No. 138-2.) Jeffrey Webster, a counter-defendant (but not a plaintiff) in this case, was a manager at Victaulic who had frequent contact with Defendants, as explained more fully below. (*Id.* ¶ 3.) Defendant HiTHERM, a California company, manufactures various "foam insulation

products." (*Id.* ¶¶ 4–5.) One of its owners, Defendant Aniq Sufi, served various key roles within HiTHERM and likewise frequently engaged with Victaulic and its representatives. (*Id.* ¶ 6.)

In 2016, Victaulic sought to incorporate into its pipe products a flame- and smoke-resistant insulation material, and Victaulic contacted HiTHERM about working collaboratively to develop such a product. (*Id.* ¶ 8.) The parties signed a confidentiality agreement ("CA") in September of that year and, in May 2017, signed a Master Joint Development Agreement ("MJDA") and Statement of Work ("SOW"), which they backdated to October 2016. (*Id.* ¶¶ 9, 11.) While the parties collaborated productively under these agreements, they also negotiated a possible acquisition or asset purchase of HiTHERM by Victaulic. (*Id.* ¶¶ 14–23.) Negotiations ultimately broke down, and in the fallout, multiple disputes between the parties arose: Whether the MJDA and SOW are enforceable; whether the parties formed a binding asset purchase agreement ("APA") in the course of their negotiations; and whether certain IP belongs to one party or the other, among other issues.

A.     **Obligations Under the MJDA and SOW**

The parties executed the MJDA "to work together to collaboratively develop . . . a commercial pipe and piping component insulation system for ultimate sale by Victaulic." (MJDA Recitals, ECF No. 138-5.) To that end, the parties agreed "to use commercially reasonable efforts to work together and to devote sufficient personnel, material, and resources to carry out the objectives of the Joint Development Program in accordance with the Development Schedule set out in the applicable SOW." (*Id.* § 2.1.) Upon completion of such objectives, "Victaulic may directly or indirectly, resell, lease, rent or otherwise distribute the Products worldwide to end users." (*Id.*)

Pursuant to the MJDA, "Jointly Developed IP" consists of intellectual property rights developed by the parties (or an individual party) "while (i) performing work pursuant to any

Statement of Work executed under this Agreement; (ii) while using equipment, supplies, facilities, trade secret information, or any other Confidential information of the other Party disclosed pursuant to the Joint Development Program, or (iii) which otherwise results, in whole or in part, from work in connection with the goals of the Joint Development Program." (*Id.* § 1.6.)  The parties assigned all Jointly Developed IP to Victaulic. (*Id.* § 4.3.)  Jointly Developed IP is distinct from other intellectual property rights that the parties reserved, however. Particularly relevant to certain claims here, "Background IP" consists of those intellectual property rights "conceived or developed by either Party, or licensed to a Party, prior to the execution of the Confidentiality, Non-Disclosure, and Intellectual Property Agreement between the Parties on September 16, 2016." (*Id.* § 1.4.)  Each party retained its Background IP rights under the MJDA. (*Id.* § 4.1.)[1]

The MJDA provides further that "[a]s HiTherm's sole and entire compensation for the performance of the Services (including the procurement of any tooling, equipment, expertise or facilities) and all other obligations under this Agreement or any SOW (including the assignment of any Jointly Developed IP as set out in Section 4.3), Victaulic will compensate HiTherm the fees set forth in the applicable SOW . . . in accordance with the Development and Fee Schedule." (*Id.* § 2.4.)  Other benefits flowing to HiTHERM include "a perpetual worldwide non-exclusive, royalty-free, nontransferable, non-assignable (except to Affiliates) license under the Jointly Developed IP to make, sell, and offer to sell Products embodying the Jointly Developed IP for any use solely in the form of bunstock which is fully reacted and untraceable as to composition

---

[1]      Another subset of rights, "Independent IP," consists of intellectual property rights that were developed contemporaneously with the parties' efforts under the MJDA but that were, in short, unrelated to the parties' joint efforts. (MJDA § 1.5.)  As discussed further below, the parties disagree as to whether certain intellectual property is Jointly Developed IP or Background IP, but it does not appear that the property at issue is alleged to be Independent IP.

and formulation . . ." (*id.* §§ 4.3, 5.3(b) (emphasis in original)), as well as a mutual indemnification for liabilities arising from the performance of the MJDA (*id.* § 10).

The MJDA also includes common clauses concerning severability and integration. The former provides that "[i]n the event any provision of this Agreement or any SOW is determined to be illegal, void, or unenforceable, the remainder of this Agreement and any SOW will continue in full force and the Parties agree to replace such unenforceable provision with a valid and enforceable provision that will achieve substantially the same effect." (*Id.* § 14.) The latter provides that "[t]his Agreement, each SOW attached hereto, and the Confidentiality, Non-Disclosure and Intellectual Property Agreement executed between the parties on September 16, 2016 (attached as Schedule A) represent the entire understanding of the Parties with respect to its subject matter and, except as specifically provided in this Agreement, supersedes all previous and contemporaneous understandings between Victaulic and HiTherm with respect to such subject matter. . . . Any terms and conditions included in an invoice, acknowledgment or other communication issued by either Party to the other will not apply to this Agreement or create any binding obligations on either Party." (*Id.* § 13.)

The SOW attached to the MJDA provides further specifications about the product to be developed and the parties' obligations as to expenses: "Victaulic agrees to pay HiTherm reasonable and fair compensation for performance of the Services as agreed and accepted by Victaulic and HiTherm from time to time"; "Victaulic shall pay HiTherm, upon the submission of proper invoices, the costs stipulated in the SOW and purchase orders for supplies/services/work delivered/rendered and accepted." (SOW § 4, ECF No. 138-6.) The SOW enumerates various milestones (such as the procurement of raw materials and the achievement of certain industry standards), dates by which those milestones were to be completed, and fees to be paid upon such completion. (*Id.* at 4–5.) Crucially, in Defendants'

view, *see infra* § III.A, every entry in the fees column provides for payment "[p]er agreed fees," not by reference to a specific sum (*see* SOW at 4–5).  In other words, the MJDA obligates Victaulic to "compensate HiTherm the fees set forth in the applicable SOW" (MJDA § 2.4), yet the SOW itself fails to specify the fee amounts (SOW at 4–5).

## B.    Acquisition Negotiations

Although the parties dispute which of them approached the other concerning a potential acquisition of HiTHERM by Victaulic, they agree that such discussions took place and resulted in a non-binding letter of intent ("NBLOI") signed on the same day as the MJDA and SOW (JSUMF ¶¶ 14–15).  That letter sketches a rough outline of the potential acquisition:  Victaulic would pay $1.2 million for HiTHERM's assets; HiTHERM's debts would be extinguished at closing, such that Victaulic would acquire HiTHERM's assets without assuming that liability; Victaulic would employ Mr. Sufi at a specified salary; and Victaulic would promptly conduct due diligence investigations.  (NBLOI at 1, ECF No. 138-7.)  As the NBLOI's name suggests, the letter expressly provides that other than confidentiality and exclusivity provisions not relevant here, "[t]his letter is intended to be an expression of interest by Victaulic and the HiTherm Entities and shall be non-binding and shall not constitute a legal agreement . . . ." (*Id.* at 2.)  The letter further conditions any potential acquisition on numerous circumstances, including Victaulic's satisfaction concerning the due diligence investigations, the approval of Victaulic's board, and the development of products compliant with certain industry standards. (*Id.* at 1–2.)

Thus began a due diligence process and the negotiation of an APA from 2018 through 2020.  (JSUMF ¶¶ 16–17.)  Of particular concern to this litigation is a redlined draft sent by an attorney for HiTHERM to a representative of Victaulic on March 6, 2020.  (*Id.* ¶ 18.) Victaulic would not respond until April 10, 2020, when it sent back another marked-up APA.

(*Id.* ¶ 19.)  Defendants' view of these events adds color to the exchange of these drafts.  In connection with Defendants' Motion for Summary Judgment, Mr. Sufi submitted a declaration in which he asserts that after Victaulic received the March 6 draft, the parties held a telephonic conference on March 17, 2020.  (Sufi MSJ Decl. ¶ 21, ECF No. 137-2.)[2]  Mr. Sufi and an attorney attended on behalf of HiTHERM, and Saleem Saab and Neal Clevenger attended on behalf of Victaulic.  (*Id.*)  Mr. Sufi claims that on this call, the Victaulic representatives assured him that the parties were, in Mr. Sufi's words, "in agreement on the terms of the March 6 APA" and that Victaulic "would make some minor grammatical changes" before sending a clean version for execution.  (*Id.*)  The draft APA circulated on April 10, however, was "heavily revised" with "new terms that were a significant departure" from the March 6 draft, such as that Mr. Sufi and his business partner would provide a personal guaranty of certain repayments to Victaulic.  (*Id.* ¶¶ 27–28.)  Mr. Sufi claims that these new terms were "a pretext to back out of" an asset purchase (*id.* ¶ 30); whatever the reason, the parties agree that these negotiations never culminated in a formally executed agreement (JSUMF ¶ 20; Sufi MSJ Decl. ¶ 31), and in September 2021, Victaulic confirmed that it was no longer proceeding with the purchase (JSUMF ¶¶ 20, 22).

## C.    Misappropriation of HiTHERM's Intellectual Property

Mr. Sufi asserts that because he believed, following the March 17 call, that "the acquisition of HiTherm was being finalized," he agreed to disclose to Mr. Webster "a copy of the proprietary HT 300 formula"—something that Mr. Sufi had previously refused to do.  (Sufi MSJ Decl. ¶¶ 24–26.)  On March 20, 2020, Mr. Sufi emailed a document to Mr. Webster titled

---

[2]     In another filing, Victaulic asked the Court to strike certain statements made in two declarations recently filed by Mr. Sufi, including the one discussed here.  The Court denied Victaulic's request in an Order (*see* ECF No. 162) and, in any event, notes that the statements cited here are not among those challenged by Victaulic.

"Victaulic Molding Foam Formulation," which Defendants assert was a version of HT-300 that Mr. Sufi developed in 2015, prior to the initiation of the parties' relationship.  Defendants claim that Victaulic later redesignated this formula as VF-18A and used it to create another formula, VF-18B.  In Mr. Sufi's view, now that Victaulic had "received the formula it sought," it had no interest in completing the asset purchase and added unacceptable terms to the April 10 draft APA as a pretext to back out of the deal.  (*Id.* ¶ 30.)

>    **D.**     **The Present Lawsuit**

After the APA negotiations fell through, HiTHERM sent Victaulic a letter demanding that Victaulic cease its use of HT-300.  (Letter from Kenneth Chung & Mark DelRosario to Aryeh Kaplan (Nov. 11, 2021), ECF No. 138-27.)  In response, Victaulic filed the present action to obtain the following relief:  (Count I) a declaratory judgment that the parties remain bound by the MJDA as a valid contract, and pursuant to that contract, any jointly developed intellectual property developed thereunder belongs to Victaulic; (Count II) under a theory of unjust enrichment, Defendants must return approximately $1.5 million in benefits conferred to it by Victaulic; (Count III) a claim for money had and received relating to that same $1.5 million sum; and (Count IV) an accounting of HiTHERM's books and records to determine the extent of Defendants' alleged misappropriation of Victaulic's funds.  (Compl. ¶¶ 59–75, ECF No. 1.)  Defendants answered these allegations and asserted counterclaims of their own: (Counterclaim I) misappropriation of trade secrets from Victaulic's and Mr. Webster's allegedly improper acquisition of the HT-300 formula and Victaulic's continuing use of it; (Counterclaim II) promissory fraud arising from Victaulic's representatives' alleged representation that Victaulic would acquire HiTHERM in exchange for the execution of the MJDA, which promise led HiTHERM to suffer adverse effects including the loss of customers and the renewal of a lease at a higher rate; (Counterclaim III) intentional misrepresentation

concerning the same circumstances as Counterclaim II; (Counterclaim IV) fraudulent inducement concerning the same; (Counterclaim V) violation of California's Unfair Competition Law relating to the failed acquisition of HiTHERM; (Counterclaim VI) Victaulic breached its obligations under the CA and MJDA, as well as under a contract that allegedly arose from the APA negotiations; (Counterclaim VII) a declaratory judgment that the APA is a valid contract which Victaulic and Mr. Webster breached, and that the HT-300 formula is HiTHERM's property. (Am. Counterclaims ¶¶ 31–97, ECF No. 101.)

Victaulic has moved for summary judgment as to its claim for declaratory relief but not as to its other claims. Victaulic has also moved for summary judgment as to all of Defendants' counterclaims other than Counterclaim V. Similarly, Defendants have moved for summary judgment as to their counterclaim for declaratory relief but not as to their other counterclaims. Defendants have also moved for summary judgment as to all of Victaulic's claims. For the below reasons, the Court rules as follows. Summary judgment is granted in favor of Victaulic as to Count I. Specifically, the Court finds that the MJDA is a valid contract that assigns Jointly Developed IP to Victaulic. Relatedly, the Court enters summary judgment in favor of Victaulic on Defendants' Counterclaim IV, as the MJDA's integration-plus provision precludes the application of fraudulent inducement as grounds for invalidating the MJDA.

Summary judgment is denied for both parties as to Counterclaim VII, as genuine disputes of material fact prevent this Court from determining whether the parties formed a valid agreement reflected by the terms of the March 6 APA. Numerous other claims brought by the parties will be affected by the jury's determination of this issue. Most obviously, the Court must deny summary judgment as to the portion of Counterclaim VI that alleges breach of the putative contract reflected by the March 6 APA. Similarly, as to Victaulic's Counts II through IV— which largely concern quasi-contractual remedies—genuine disputes of material fact prevent this

Court from entering summary judgment in favor of Defendants.  Should a jury find that the March 6 APA was a valid contract, however, Defendants may re-assert their position that such contract precludes these quasi-contractual remedies.  Summary judgment in favor of Victaulic is likewise denied as to Defendants' Counterclaims II and III, as these fraud-based counterclaims are *not* barred by the MJDA's integration-plus provision; but, if a jury determines that the March 6 APA represents a valid contract, Victaulic may re-assert its position that these fraud-based counterclaims arise from the parties' duties under that contract and are therefore barred by the gist of the action doctrine.

As to Counterclaim I, which concerns trade secret misappropriation, the Court cannot enter summary judgment when it lacks sufficient undisputed information in the record concerning the sole or joint creation of the relevant formula and how it compares to prior and later iterations.  In turn, as to the portions of Counterclaim VI that allege that Victaulic breached the CA and MJDA through its alleged trade secret misappropriation, the Court must likewise deny Victaulic's request for summary judgment.  The Court will, however, enter summary judgment in favor of Victaulic as to the portion of Counterclaim VI that alleges that Victaulic breached these agreements by disclosing confidential information to third parties, as Defendants have not pointed to any evidence in the record of such third-party disclosure.

## II.   JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over the claims in this matter pursuant to 28 U.S.C. § 1332(a)(1), as the parties are diverse in citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Venue is proper under 28 U.S.C. § 1391(b)(2) because Victaulic is an Easton company, and accordingly a substantial part of the events in this case occurred in this District.

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  On a motion for summary judgment, the Court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted).  If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."  *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted).  Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

## III.   ANALYSIS

### A.   The MJDA

The MJDA provides that Pennsylvania law governs its interpretation and enforcement. (MJDA § 11.)[3]  Under Pennsylvania law, "the elements of a valid and binding contract are:

---

[3]     Because this Court exercises diversity jurisdiction over this action, it must apply the choice of law principles of Pennsylvania, the forum state.  *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012).  "Pennsylvania courts generally honor the parties' choice of law provisions," *Nationwide Mut. Ins. Co. v. West*, 807 A.2d 916, 920 (Pa. Super. Ct. 2002), unless doing so would "conflict[] with strong public policy interests,"

(1) the manifestation of an intent to be bound by the terms of the agreement; (2) sufficiently definite terms; and (3) an agreement supported by adequate consideration." *Giannone v. Giannone*, 429 F. Supp. 3d 34, 40 (E.D. Pa. 2019) (citing *Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct. 1995)).   Defendants argue as follows: (1) because the MJDA, together with the SOW, fails to specify the milestone fee amounts, and because such fees were to be HiTHERM's "sole and entire compensation" (MJDA § 2.4), the MJDA suffers from a failure of consideration; (2) similarly, the failure to specify the milestone fee amounts indicates that the MJDA lacks sufficiently definite terms; and (3) there are disputes of material fact as to whether Victaulic and its representatives fraudulently induced Defendants to sign the MJDA.   The Court considers these issues in turn.

### 1.   Failure of Consideration

From the outset, the Court must distinguish between a "lack" or "want" of consideration and a "failure" of consideration.   The former addresses a situation in which an agreement, by its own terms, does not provide for consideration sufficient to support the agreement; the latter, by contrast, "occurs when the consideration bargained for does not pass, in whole or in part, to the promisor." *McGuire v. Schneider, Inc.*, 534 A.2d 115, 118 (Pa. Super. Ct. 1987), *aff'd*, 548 A.2d 1223 (Pa. 1988).   In other words, the defense of failure of consideration "does not contradict the terms of the instrument, but shows that the consideration contemplated was never received." *Id.* at 119 (quoting *In re Levine's Est.*, 118 A.2d 741, 742 (Pa. 1955)).   HiTHERM invokes a failure of consideration here.[4]

---

*Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 56 (3d Cir. 1994).   The parties have not claimed any such conflict here.

[4]     Although Defendants mention a "lack" of consideration in one heading of their brief (*see* Mem. of P. & A. in Supp. of Defs./Counterclaimants HiTHERM, LLC and Aniq Sufi's Mot. for

Before reaching the merits of this issue, however, the Court must consider whether HiTHERM has appropriately raised this affirmative defense. Rule 8 of the Federal Rules of Civil Procedure requires that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . failure of consideration . . . ." Fed. R. Civ. P. 8(c)(1). Because this Court sits in diversity, it must also consider whether Pennsylvania law treats failure of consideration as an affirmative defense. *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 321 & n.6 (3d Cir. 2006). And, indeed, Pennsylvania procedural rules provide that "all affirmative defenses including but not limited to the defense[] of . . . failure of consideration . . . shall be pleaded in a responsive pleading . . . ." Pa.R.C.P. 1030(a). HiTHERM failed to raise the affirmative defense of failure of consideration in either its initial responsive pleading (*see* Answer, ECF No. 89) or a subsequent amended version (*see* Am. Answer, ECF No. 101), never sought leave to amend its pleadings to add this defense, and, in fact, did not raise it until the present summary judgment phase of this case, approximately one year after the close of fact discovery.

Although the Court may excuse the failure to plead an affirmative defense where the opposing party suffers no prejudice, *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991), Victaulic has suffered prejudice here by being deprived of the opportunity to depose Mr. Sufi

---

Summ. J. at 18, ECF No. 137), the content of that section solely addresses a "failure" of consideration, and the Court therefore understands Defendants to be raising only that latter defense. In any event, the Court finds that the MJDA does not lack consideration. "Consideration 'confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986) (quoting *Curry v. Est. of Thompson*, 481 A.2d 658, 661 (Pa. Super. Ct. 1984)). Pursuant to the MJDA, and even setting aside the issue of unspecified milestone fees, Victaulic granted HiTHERM a broad license to sell products comprising Jointly Developed IP in bunstock form (MJDA §§ 4.3, 5.3(b)), promised to reimburse HiTHERM for services and supplies (*id.* § 2.4; SOW § 4), and agreed to a mutual indemnification (MJDA § 10).

concerning Mr. Sufi's newly raised contentions that the parties never "came to an agreement . . . on the fees that were to be paid to HiTherm under the MJDA" and that "Victaulic has never paid HiTherm any fee payment under the MJDA whatsoever."  (Sufi MSJ Decl. ¶ 15.)  Injecting a new issue into the case after the close of fact discovery, thereby depriving the opposing party of the opportunity to develop a record thereon, is precisely the kind of prejudice that warrants precluding Defendants from asserting this affirmative defense so late in the game.  *See, e.g.*, *Parkell v. Senato*, 2019 WL 1435883, at \*7 (D. Del. Mar. 31, 2019) (finding that the defendants waived an affirmative defense asserted "more than four years after the Complaint, after two previous rounds of summary judgment briefing, and almost a month after the close of discovery"); *Harris v. Vitran Express, Inc.*, 2016 WL 6495995, at \*6 (W.D. Pa. Nov. 2, 2016) (because "[f]ailure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense," and because "Pennsylvania has held that rescission is an affirmative defense and failure to raise it constitutes a waiver," the court rejected the defendant's argument that the contract should be rescinded by reason of failure of consideration (quoting *Charpentier*, 937 F.2d at 863).[5]

Alternatively, even if the Court reached the merits of Defendants' position, any failure of consideration here would be at most partial, not complete, and therefore rescission of the entire

---

[5]     In the context of opening prior judgments and contesting "sealed instruments," Pennsylvania courts have stated that "[f]ailure of consideration goes to the heart of any claim based on an agreement and is thus always available as a defense to that claim."  *M.N.C. Corp. v. Mount Lebanon Med. Ctr., Inc.*, 509 A.2d 1256, 1259 (Pa. 1986) (citing *In re Levine's Est.*, 118 A.2d at 742).  This Court is not aware of a case interpreting this use of "always" to mean that in all contexts, and notwithstanding Pa.R.C.P. 1030(a), a defendant need not raise a failure of consideration in the defendant's responsive pleading.  Indeed, another Pennsylvania Supreme Court opinion issued shortly before *Levine* faulted a defendant precisely for failing, after successfully opening a prior judgment, to plead the affirmative defense of failure of consideration, as required by the then-relevant procedural rule.  *Poelcher v. Zink*, 101 A.2d 628, 630 (Pa. 1954).  Accordingly, the Court rejects HiTHERM's position that it had no obligation to raise this affirmative defense prior to the present late hour.

MJDA and SOW would be inappropriate.  The SOW provides that "Victaulic shall pay HiTherm, upon the submission of proper invoices, the costs stipulated in the SOW and purchase orders for supplies/services/work delivered/rendered and accepted."  (SOW § 4.)  The SOW's list of milestones includes the procurement of raw materials and the provision of services relating to prototyping and testing.  (SOW at 4–5.)  Victaulic has cited to documents in the record reflecting invoices from HiTHERM for precisely such materials and services.  (Mem. of Law in Supp. of Victaulic and Jeffrey Webster's Mot. in Opp. to HiTHERM's Mot. for Summ. J. at 3–4, 11 (gathering record citations), ECF No. 141.)[6]  Further, HiTHERM received additional consideration in the form of "a perpetual worldwide non-exclusive, royalty-free . . . license . . . to make, sell, and offer to sell Products embodying the Jointly Developed IP for any use <u>solely</u> in the form of bunstock . . ." (MJDA §§ 4.3, 5.3(b) (emphasis in original)), and a mutual indemnification (*id.* § 10).

To the extent that Defendants believe that Victaulic owes HiTHERM additional fees for achieving the applicable milestones, the appropriate course is for Defendants to pursue those lost payments, not to seek to invalidate the entire MJDA.  *See, e.g.*, *Maritz Inc. v. Holy Redeemer Hosp. & Med. Ctr., Inc.*, 1993 WL 460796, at *3 (E.D. Pa. Nov. 3, 1993) ("When there is a complete failure of consideration, the other party's obligation to render further performance under the contract is excused.  A partial failure of consideration, on the other hand, does not excuse the other party's performance.  Instead, such failure is merely ground for abatement of

---

[6]     Mr. Sufi's assertions (*see* Sufi MSJ Decl. ¶ 15) that the parties never "came to an agreement . . . on the fees that were to be paid to HiTherm under the MJDA" and that "Victaulic has never paid HiTherm any fee payment under the MJDA whatsoever" do not create a genuine dispute about this point.  Considering the conclusory nature of Mr. Sufi's statements and the volume of record evidence cited by Victaulic, Mr. Sufi's assertions are merely "colorable" and "not significantly probative"—a kind of evidence that does not preclude summary judgment for the moving party.  *Anderson*, 477 U.S. at 249–50.

damages unless it goes to the root of the contract." (cleaned up)); *Cabot v. Jamie Rec. Co.*, 1999 WL 236737, at *6 (E.D. Pa. Apr. 19, 1999) (rescission not warranted where a party had made some but not all of the contracted-for payments, because (1) "[u]nder Pennsylvania law, rescission 'is appropriate only under *extraordinary circumstances* when the complaining party has suffered a breach of such a fundamental and material nature that it affects the very essence of the contract and serves to defeat the object of the parties,'" and (2) "[i]t is well settled that a party may not avail itself of the equity powers of the court [such as rescission] if there exists or existed an adequate remedy at law," such as "an award of damages" (first quoting *Castle v. Cohen*, 676 F. Supp. 620, 627 (E.D. Pa. 1987) (emphasis added), and then citing *Casey v. Philadelphia Auto Sales Co.*, 236 A.2d 800, 802 (Pa. 1968))), *aff'd*, 248 F.3d 1129 (3d Cir. 2000).

Further, the parties clearly negotiated for the very situation now before this Court and agreed that "[i]n the event any provision of this Agreement or any SOW is determined to be illegal, void, or unenforceable, the remainder of this Agreement and any SOW will continue in full force and the Parties agree to replace such unenforceable provision with a valid and enforceable provision that will achieve substantially the same effect."   (MJDA § 14.)   In contravention of this mutually-agreed-to provision, Defendants now ask this Court to vitiate the entire contract because one portion of the SOW—that pertaining to milestone fees—failed to specify the applicable payments.  This Court cannot take such drastic action.  *Cf. Obara Realty Grp., LLC v. Atlas Real Est. Invs., LLC*, 279 A.3d 614, 618 (Pa. Super. Ct. 2022) (upholding the rejection of the defendant's failure-of-consideration defense where the plaintiff had not disbursed full payment, because "the parties bargained for the potential that only a portion of the principal sum would be disbursed").

### 2.      Sufficiently Definite Terms

Under the Pennsylvania law cited further above, one requirement of a valid contract is that it have "sufficiently definite terms." *Giannone*, 429 F. Supp. 3d at 40.  As the qualifier "sufficiently" indicates, the terms need not be comprehensively defined; instead, "an agreement with open terms may nevertheless constitute an enforceable contract." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998).  Even "the omission of an essential term in a contract, such as price, does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." *Id.* at 667.  This is because Pennsylvania law "does not favor, but leans against, the destruction of contracts because of uncertainty." *Rossmassler v. Spielberger*, 112 A. 876, 880 (Pa. 1921).  The Court's "paramount goal" in this analysis "is to ascertain and give effect to the intent of the parties." *ATACS*, 155 F.3d at 667 (quoting *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987)).

Here, Defendants rest on the fact that the MJDA provided that the SOW would set forth the applicable payments, and the SOW itself determined such payments to be "[p]er agreed fees."  Pennsylvania courts have acknowledged, however, that "[o]ne or both parties may perform in such a way as to make definite that which was previously unclear." *Greene*, 526 A.2d at 1194; *see also Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 n.6 (1978) (endorsing a draft comment from the Restatement (Second) of Contracts providing that "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning").  Such was the case here.  For nearly four years after the execution of the MJDA and SOW, the parties pursued their joint goals and HiTHERM invoiced Victaulic for services and materials without incident.  Such mutual performance demonstrates that the parties understood the terms of these documents notwithstanding the open-ended nature of the SOW's

fees schedule.  It also demonstrates that for this Court to "give effect to the intent of the parties," as it must, *ATACS*, 155 F.3d at 667, the Court must find that the MJDA and SOW contained sufficiently definite terms, and Defendants have not provided any basis to believe that there persists on this point a genuine dispute for a jury to resolve.[7]

### 3.    Fraudulent Inducement

As its third basis for invalidating the MJDA, Defendants seek rescission on a theory of fraudulent inducement (Counterclaim IV).  Victaulic moved for summary judgment on this claim and two other fraud-based claims (Counterclaims II and III) on the grounds that the MJDA's integration clause precludes them.  Because this clause indeed forecloses Defendants' ability to claim that it relied on any pre-MJDA representations, the Court rejects fraudulent inducement as a basis for invalidating that agreement and enters summary judgment in favor of Victaulic as to Counterclaim IV.  The Court addresses Counterclaims II and III further below.  *See infra* § III.C.1.

To prove fraud under Pennsylvania law, HiTHERM must establish, by clear and convincing evidence, six elements:

> (1) (a) A misrepresentation or
>       (b) A concealment;
> (2) Which is material to the transaction at hand;
> (3) (a) Made with knowledge of its falsity or recklessness as to
>           whether it is true or false (for a misrepresentation), or
>       (b) Calculated to deceive (for a concealment);
> (4) With the intent of misleading another into relying on it;
> (5) Justifiable reliance on the misrepresentation; and
> (6) A resulting injury proximately caused by such reliance.

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022) (gathering cases).  Specific to Defendants' counterclaim here, "[a] claim for fraudulent inducement requires proof

---

[7]    For the reasons set forth above, *see supra* note 6, Mr. Sufi's declaration does not create a genuine dispute about the definiteness of the SOW's fees schedule.

of the [foregoing] six elements and is available when a person under no duty to enter a contract was deceived into doing so." *Id.* at 206 (citing *Coll. Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 206 (Pa. 1976)).

The *SodexoMAGIC* case also involved the interaction of a fraudulent inducement claim and an integration provision. The Third Circuit explained that although Pennsylvania's "parol evidence rule *acting alone* does not prevent fraudulent inducement claims arising out of integrated contracts," some contracts "contain fraud-insulating clauses" that may so operate. *Id.* at 213. For example, a contract may "state that the representations in the contract . . . supersede all prior representations . . . ." *Id.* at 214 (citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 431 (Pa. 2004)). These "integration-plus" provisions "extend[] the reach of the parol evidence rule" such that "it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim." *Id.* (citing *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007) ("[A] party cannot be said to have justifiably relied on prior representations that he has superseded and disclaimed.")).

Here, the MJDA's integration clause provides, in relevant part, as follows:

> This Agreement, each SOW attached hereto, and the Confidentiality, Non-Disclosure and Intellectual Property Agreement executed between the parties on September 16, 2016 (attached as Schedule A) represent the entire understanding of the Parties with respect to its subject matter and, except as specifically provided in this Agreement, supersedes all previous and contemporaneous understandings between Victaulic and HiTherm with respect to such subject matter. . . . Any terms and conditions included in an invoice, acknowledgment or other communication issued by either Party to the other will not apply to this Agreement or create any binding obligations on either Party.

(MJDA § 13.) This clause represents an integration-plus provision that bars HiTHERM's fraudulent inducement claim.

HiTHERM argues that the clause expressly limits itself to the MJDA's "subject matter," and because, in HiTHERM's view, the MJDA concerns joint research and product development—not Victaulic's potential acquisition of HiTHERM—the MJDA's integration-plus provision therefore does not bar the allegedly fraudulent representations about the potential acquisition.  This framing, although clever, is dubious.  As the MJDA itself notes, the MJDA "set[s] out the terms by which [the parties] will collaborate . . . ."  (*Id.* § 2.1.)  Given that HiTHERM now claims that its acquisition by Victaulic was one such condition of the parties' collaboration, the Court cannot say that representations concerning the potential acquisition fall outside of the "subject matter" of the MJDA.  Even were the Court to agree with HiTHERM on this point, however, HiTHERM ignores the far more expansive clause that follows, in which the parties agreed that "[a]ny terms and conditions included in a[] . . . communication issued by either Party to the other will not . . . create any binding obligations on either Party."  (*Id.* § 13.)  The parties chose not to limit this language to any particular "subject matter," and any representations about the potential acquisition therefore fall well within the scope of the integration-plus provision when it is read in full.

HiTHERM argues alternatively that because the parties signed the MJDA on the same day as the NBLOI, the Court should construe those documents together.  Such a construction establishes, in HiTHERM's view, that the parties viewed the potential acquisition as part of the MJDA and, therefore, the parol evidence rule does not bar extrinsic evidence concerning this topic.  To use the NBLOI in determining the parties' intent under the MJDA, the Court must agree with HiTHERM's position that the NBLOI and MJDA were executed contemporaneously (which the parties do not dispute) and concern the same subject matter.  *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986).  This second element is a notable departure from HiTHERM's prior position that the MJDA's subject matter was solely the

parties' joint development project and *not* Victaulic's potential acquisition of HiTHERM.  Even if the Court used the NBLOI to help interpret the MJDA, however, the former does not support HiTHERM's claim that the parties intended for an acquisition to be a condition of the latter; in fact, the NBLOI proves the opposite.  The parties agreed in the NBLOI that "[t]his letter is intended to be an expression of interest by Victaulic and the HiTherm Entities and shall be non-binding and shall not constitute a legal agreement . . . ."  (NBLOI at 2.)  Also pursuant to the NBLOI, the potential acquisition hinged on numerous contingencies, including a satisfactory due diligence process.  (*Id.* at 1–2.)  The Court finds, therefore, that as a matter of law, the NBLOI does not illuminate the terms of the MJDA in a manner favorable to HiTHERM's position.

For the foregoing reasons, there is no genuine dispute as to the continuing validity of the MJDA.  The Court therefore enters summary judgment in favor of Victaulic on this issue.

### B.     The March 6 APA

Defendants seek a declaratory judgment that, *inter alia*, the parties formed a valid contract based on the draft APA circulated on March 6 and a conference call that occurred shortly thereafter.  Defendants' claim for breach of contract also relies on the existence of a valid APA.[8]  Defendants have moved for summary judgment on its declaratory judgment claim; Victaulic has moved for the same as to both that claim and the breach of contract claim.  Because a genuine dispute of material fact exists as to whether the March 6 APA represents a valid contract formed by the parties, the Court cannot enter summary judgment on Defendants' declaratory relief and breach of contract counterclaims.

---

[8]     Defendants' breach of contract counterclaim also alleges breach of the CA and MJDA, which this Court addresses below.  *See infra* § III.C.3.

As set forth above, *see supra* § III.A, to establish that the March 6 APA is a valid contract, HiTHERM must prove three elements:  "(1) the manifestation of an intent to be bound by the terms of the agreement; (2) sufficiently definite terms; and (3) an agreement supported by adequate consideration."  *Giannone*, 429 F. Supp. at 40.[9]  Victaulic has not argued that the agreement lacked adequate consideration.  And although Victaulic noted that HiTHERM failed to set forth any essential terms of the March 6 APA in its pleadings, HiTHERM has since filed that document (*see* March 6 APA, ECF No. 144-10), and the Court finds that the March 6 APA's detailed provisions (including, *inter alia*, the price to be paid, the assets to be purchased, and the parties' obligations in closing) foreclose any claim of insufficiently definite terms.  The Court therefore turns to the issue of whether the parties manifested an intent to be bound by the terms of the March 6 APA, including whether Victaulic expressly conditioned its intent to be bound upon its formal execution of the document.

The Pennsylvania Supreme Court has explained that "[a]s a general rule, signatures are not required [for the formation of a valid contract] unless such signing is expressly required by . . . the intent of the parties."  *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 136 (Pa. 1999) (citing *L. B. Foster Co. v. Tri-W Const. Co.*, 186 A.2d 18, 19 (Pa. 1962)).  Where, as here, the contract at issue does not itself expressly require signatures for

---

[9]     Because this Court sits in diversity, it applies the choice of law rules of Pennsylvania, the forum state.  *Craftmark Homes, Inc. v. Nanticoke Const. Co.*, 526 F.2d 790, 792 n.2 (3d Cir. 1975).  Pennsylvania courts, in turn, consider "the place where a contract is made and where it is to be performed."  *Id.* (citing *In re Est. of Danz*, 283 A.2d 282 (Pa. 1971); *Formigli Corp. v. Alcar Builders, Inc.*, 329 F.2d 79 (3d Cir. 1964)).  Although the contract appears to have been negotiated between California and Pennsylvania by email, it was Victaulic, a Pennsylvania company, that was to purchase and receive the assets of HiTHERM.  The Court therefore finds it appropriate to apply Pennsylvania law.  The parties implicitly agree, as they both have applied Pennsylvania law to this issue in their briefing.

the contract to be valid, the Court must discern whether the parties otherwise intended to create such a requirement:

> [T]he mere presence of signature lines does not determine whether the parties intended to be bound only upon the execution of the document by all the signatories.  Instead, the inquiry is properly directed to whether the parties agreed to the terms in question and intended to be bound by the terms of the contract.  "Where the parties have agreed orally to all the terms of their contract, and a part of the mutual understanding is that a written contract embodying these terms shall be drawn and executed by the respective parties, such oral contract may be enforced, though one of the parties thereafter refuses to execute the written contract."

*Id.* at 138 (citation omitted) (quoting *Ketchum v. Conneaut Lake Co.*, 163 A. 534, 535 (Pa. 1932)).  The *Shovel Transfer* court then considered subsequent communications and conduct between the parties to find that they had intended to be bound by the contract at issue despite that it ultimately went unexecuted.  *Id.* at 138–39.

     With these principles in mind, the Court finds that the record reflects a genuine issue as to the parties' understanding of the finality of the March 6 APA.  On March 17, 2020, Victaulic representatives allegedly conveyed to Mr. Sufi that Victaulic was satisfied with the terms of the March 6 APA (Sufi Opp. Decl. ¶ 37, ECF No. 142-3), and Mr. Webster allegedly indicated that "all that was needed was for the APA to be signed" (Am. Counterclaims ¶ 24).  Defendants also note that their subsequent conduct demonstrates an understanding that the asset purchase was a done deal—namely, Defendants disclosed the HT-300 formula to Mr. Webster, extended their expiring lease, and informed clients that HiTHERM was about to be purchased.  (Sufi Opp. Decl. ¶¶ 39, 44.)

     That said, Victaulic eventually sent Defendants a counterproposal with materially different terms on April 10, 2024, and the parties ultimately never executed an APA.  (JSUMF ¶¶ 19–20.)  Victaulic also interprets Mr. Webster's aforementioned comment—that "all that was

needed was for the APA to be signed"—to indicate not that the deal was complete for practical purposes, but rather that it would *only* be complete once the requisite authorities signed it. Victaulic points further to subsequent conduct that belies a completed contract, including Defendants' continued negotiation of the APA terms after Victaulic returned the April 10 draft. Such subsequent negotiations could indeed indicate that the parties never reached agreement as to the March 6 APA, though their existence is also consistent with the version of events in which Victaulic initially agreed to the terms of the March 6 APA and later attempted to back out of that purported deal.   Finally, Mr. Sufi himself has provided arguably conflicting deposition testimony:  He expressed his beliefs that, on one hand, the parties had agreed to the terms of the March 6 APA, and that, on the other hand, he believed that "[n]othing is binding until it's signed."  (Sufi Dep. 253:12–254:5, ECF No. 140-1.)

On summary judgment, the Court cannot weigh this conflicting evidence or make a credibility determination as to Mr. Sufi's recollection of the March 17 conversation with Victaulic representatives.   Accordingly, the Court cannot enter summary judgment in favor of either party as to whether the March 6 APA constitutes a valid contract.[10]   In turn, because part of Defendants' breach of contract claim turns on this very issue, the Court declines to enter summary judgment on that counterclaim as well.

---

[10]     Victaulic also seeks dismissal of Defendants' declaratory relief counterclaim on that grounds that it is duplicative of the breach of contract counterclaim.  These counterclaims are not entirely congruous, however, as the declaratory relief counterclaim also seeks to establish that "HITHERM is the sole legal owner of the HT-300 formula prior to the execution of the APA" and "has the right to obtain payment withheld by VICTUALIC for the disclosure of the HT-300 formula."  (Am. Counterclaims at 38.)   The parties have not briefed this other portion of Defendants' declaratory relief counterclaim, and the Court therefore makes no ruling on it.

## C.      Defendants' Remaining Counterclaims

As set forth above, the Court has (1) rejected Defendants' theory that fraudulent inducement supports the invalidation of the MJDA (Counterclaim IV), (2) declined to enter, due to a genuine dispute of material fact, a declaratory judgment that the March 6 APA is a valid contract (Counterclaim VII), and (3) for the same reason, declined to enter summary judgment as to the counterclaim that Victaulic breached the March 6 APA (Counterclaim VI).  Still remaining are Defendants' counterclaims for other fraud offenses (Counterclaims II, III), trade secret misappropriation (Counterclaim I), and breach of contract as to the CA and MJDA (Counterclaim VI).[11]  The Court considers each in turn.

### 1.      Fraud-Based Counterclaims

Defendants bring two counterclaims for promissory fraud and intentional misrepresentation.  For both counterclaims, Defendants allege that they relied on Victaulic's representation that it would buy HiTHERM when Defendants signed the MJDA, renewed an expiring lease at a higher rent than before, and implemented various other changes to their business.  (Am. Counterclaims ¶¶ 41, 43–44, 51, 54.)  This Court determined above that the MJDA's integration-plus provision precludes any claim of fraud relating to the formation of that agreement.  But Defendants invoke the other fraudulent conduct alleged in these counterclaims not as a basis to invalidate the MJDA, but rather as a basis to recover losses that flowed from the business changes that HiTHERM undertook on the belief that it was about to be acquired.  (*See* Am. Counterclaims at 37–38 (requesting damages *and* rescission of the MJDA for the fraudulent inducement counterclaim, but only requesting damages for the promissory fraud and intentional

---

[11]      Omitted from this list is Counterclaim V, which concerns an alleged violation of California's Unfair Competition Law.  Neither party has moved for summary judgment as to this counterclaim.

misrepresentation counterclaims).)  Accordingly, the Court rejects Victaulic's position that if the MJDA's integration-plus provision precludes the fraudulent inducement counterclaim, it necessarily also precludes Defendants' other fraud-based counterclaims.

Alternatively, Victaulic argues that the "gist of the action" doctrine bars these remaining two fraud-based counterclaims.  That doctrine precludes claimants from recasting breach-of-contract claims as tort claims where "the duty breached is one created by the parties by the terms of their contract."  *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014).  Where, however, "the claim involves the [opposing party's] violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort" and is not barred by the gist of the action doctrine.  *Id.*

The Court finds that if this doctrine bars Defendants' counterclaims at all, it could do so only on the theory that these counterclaims concern contractual duties imposed by the March 6 APA, not the MJDA, because Defendants have presented their alleged losses as flowing from their belief that Victaulic would imminently purchase HiTHERM's assets, not from any obligations under the MJDA.  And because this Court determined that a jury must decide whether the March 6 APA is a valid contract in the first place, the Court cannot at this time find that the existence of that disputed contract precludes Defendants' remaining fraud-based counterclaims.  If, at trial, a jury finds that the parties indeed entered into a binding contract reflected by the terms of the March 6 APA, Victaulic may renew its gist of the action argument at that point, and Defendants' counterclaims will survive only if they involve a "violation of a broader social duty" that "exists regardless of the" March 6 APA.

### 2.     Trade Secret Misappropriation

Defendants' trade secret misappropriation counterclaim alleges that Victaulic improperly gained access to HiTHERM's (1) customer and supplier lists and (2) proprietary formula,

HT-300.   (Am. Counterclaims ¶ 35.)   Defendants seek damages to remedy their losses and injunctive relief to enjoin Victaulic from continuing to use this information.   (*Id.* ¶¶ 37–38.)   At oral argument, counsel for Defendants clarified that notwithstanding these pleadings, Defendants are only pursuing this claim as to "the formula that was disclosed on March 20th of 2020," not the customer and supplier lists.   (Tr. of Mots. Hr'g 54:9–11, ECF No. 156.)   Accordingly, the Court grants summary judgment in favor of Victaulic as to the portion of this claim concerning the customer and supplier lists.   As to the misappropriation of HT-300, because a genuine issue exists as to the creation and composition of the formula that Victaulic allegedly misappropriated, the Court declines to enter summary judgment in Victaulic's favor.

To establish a claim for trade secret misappropriation under California law,[12] a claimant must prove that "(1) the [claimant] owned a trade secret, (2) the [opposing party] acquired, disclosed, or used the [claimant's] trade secret through improper means, and (3) the [opposing party's] actions damaged the [claimant]." *Chargepoint, Inc. v. Claborne*, 2022 WL 14812642, at *5 (N.D. Cal. Oct. 25, 2022) (quoting *CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*, 160 Cal. App. 4th 288, 296 (Cal. Ct. App. 2008)).   The relevant statute defines misappropriation "as the (1) acquisition, (2) disclosure, or (3) use of a trade secret through improper means." *Id.* (citing Cal. Civ. Code § 3426.1(b)).   Such "improper means" includes, in relevant part, "theft, . . . misrepresentation, [or] breach or inducement of a breach of a duty to maintain secrecy . . . ." Cal. Civ. Code § 3426.1(a).

At issue here is a March 2020 email exchange in which Mr. Sufi emailed a document to Mr. Webster titled "Victaulic Molding Foam Formulation."   Defendants' counterclaim turns on whether this formula was Jointly Developed IP under the MJDA, as that agreement assigns such

---

[12]    Defendants brought this counterclaim under California law, and Victaulic has not argued that Pennsylvania trade secrets law should apply instead.

IP to Victaulic, and Mr. Webster and Victaulic cannot misappropriate what is already their own property.  In support of its position that this formula was jointly developed, Victaulic notes that Mr. Sufi sent the email while the parties were working under the MJDA, and Mr. Sufi titled the document "*Victaulic* Molding Foam Formulation" (emphasis added).  Victaulic also points to the CA and MJDA as evidence that each party understood that its confidential information might reach the other.

In Defendants' view, however, the formula emailed to Victaulic was not the fruit of joint development but rather was a version of HT-300 that Defendants had created in 2015, prior to the signing of the CA.  The MJDA deems such pre-CA IP as "Background IP," the rights to which each party retains for itself.  (MJDA § 4.1.)  Defendants claim that Victaulic later redesignated this formula as VF-18A and used it to create another formula, VF-18B.  As further evidence that this formula was Background IP, not Jointly Developed IP, Defendants point to the fact that Mr. Sufi only agreed to send this formula to Mr. Webster because Mr. Webster misled Mr. Sufi to believe that Victaulic's acquisition of HiTHERM was nearly finalized.  (Sufi Opp. Decl. ¶ 40.)  Defendants also note that Mr. Sufi conditioned the disclosure of this formula on Mr. Webster agreeing not to share this formula with Victaulic until the March 6 APA was executed, though Mr. Webster allegedly immediately provided it to Victaulic anyway.  (*Id.* ¶ 42.)

Without much undisputed information in the record concerning the sole or joint creation of the formula emailed to Mr. Webster and how it compares to prior and later iterations, the Court cannot enter summary judgment in favor of either party.  Although certain circumstantial evidence supports the theory that the formula was Jointly Developed IP under the MJDA,

HiTHERM has raised enough doubt as to this conclusion that there exists a genuine dispute of material fact.[13]

### 3.    Breach of Contract as to the CA and MJDA

Defendants claim that Victaulic breached the CA and MJDA "through its disclosure of HITHERM's confidential information to third parties and misappropriation of TRADE SECRETS."  (Am. Counterclaims ¶¶ 88, 91.)  As to misappropriation, the parties rest on their

---

[13]    Victaulic also raises a statute of limitations defense to Defendants' trade secret misappropriation counterclaim.  Focusing on the 2017 disclosure of customer and supplier lists and Victaulic's acknowledgment in 2018 that it would not acquire HiTHERM but would instead be interested in an asset purchase, Victaulic argues that Defendants should have known then that Victaulic could not be trusted to follow through on its promises to Defendants.  As noted above, Defendants have abandoned the portion of their counterclaim concerning customer and supplier lists, and the Court accordingly entered summary judgment in favor of Victaulic as to that issue.  The alleged misappropriation of the emailed formula took place no earlier than April 2020, and considering that Defendants filed their initial counterclaims in August 2022 (*see* ECF No. 89), Defendants argue that they satisfied their three-year deadline.  *See* Cal. Civ. Code § 3426.6.

Victaulic, however, notes that California law has rejected the "continuing wrong" theory, whereby "each subsequent act of misappropriation of a trade secret creates a new claim for a plaintiff and begins a new period of limitations."  *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 525 (N.D. Cal. 2000) (quoting *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 653–54 (N.D. Cal. 1993)).    Instead, California  law  provides  that  "a  continuing  misappropriation constitutes a single claim," Cal. Civ. Code § 3426.6, because "once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should know that there is a risk that that defendant will commit additional acts of misappropriation, whether they involve repeated misappropriations of one trade secret or initial misappropriations of other confidences," *Forcier*, 123 F. Supp. 2d at 525 (quoting *Intermedics*, 822 F. Supp. at 654).

The Court disagrees with Victaulic that its shift in 2018 from acquisition of HiTHERM to asset purchase should have alerted Defendants to the possibility that Victaulic had misappropriated its customer and client lists and would continue to do so as to other trade secrets that Defendants shared with Victaulic.  HiTHERM was at least somewhat agreeable to changing the legal form of the transaction, and the parties continued to negotiate the deal and work collaboratively together under the MJDA.  At the earliest, Defendants may reasonably be expected to have doubted Victaulic's motives when Victaulic returned a draft APA on April 10, 2020, with key terms that substantially differed from those of the March 6 APA.  Because Defendants filed their counterclaims in August 2022, less than three years from April 2020, Defendants' misappropriation of trade secrets counterclaim is not time-barred.

above positions, and because the Court declined to enter summary judgment on the trade secrets misappropriation claim, it likewise follows suit here. Victaulic, however, also argues that Defendants have failed to point to any instance of Victaulic disclosing confidential information to third parties, and Defendants offer no argument in response. The Court agrees that Defendants, other than making the allegation in their Amended Counterclaims, have not identified in the record any such instance of improper disclosure, nor have they briefed the issue after Victaulic raised it. Accordingly, the Court enters summary judgment in favor of Victaulic as to that portion of Counterclaim VI. Only the misappropriation portion of this counterclaim will proceed to trial.

### D. Victaulic's Remaining Claims

In Counts II through IV, Victaulic brings claims of unjust enrichment and restitution, money had and received, and accounting, respectively. Defendants have moved for summary judgment as to these counts, but for the following reasons, the Court cannot enter it in Defendants' favor at this time.

#### 1. Unjust Enrichment and Restitution

To establish a claim for unjust enrichment, Victaulic must prove the following: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value." *Deemac Servs., LLC v. Republic Steel*, 2023 WL 414444, at *8 (W.D. Pa. Jan. 25, 2023) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 277 (3d Cir. 2007)). HiTHERM does not challenge the first two elements but instead offers three bases for rejecting Victaulic's claim: (1) Victaulic has not established the third element (that retention of the benefits would be inequitable); (2) unjust enrichment is unavailable because the parties' relationships was governed by a written contract,

the March 6 APA; and (3) Victaulic cannot quantify the monetary value of the benefit that HiTHERM allegedly unjustly retained.  The Court considers each position in turn.

### i.     Inequitable Retention of Benefits

As to the first position, Defendants acknowledge that Victaulic forwarded them funds to pay off some of HiTHERM's debts and to purchase raw materials for HiTHERM's use.  But Defendants argue that HiTHERM's retention of these funds is not inequitable because "these expenditures were intended to be advances on the purchase price in Victaulic's acquisition of HiTherm."  (Mem. of P. & A. in Supp. of Defs./Counterclaimants HiTHERM, LLC and Aniq Sufi's Mot. for Summ. J. at 20.)  Framed this way, one would expect that the value of these advances would be *subtracted* from the initial purchase price of HiTHERM, which was $1.2 million according to the NBLOI.  But Defendants claim that the parties intended for these advances to be *added* to that purchase price, explaining why the figure in the March 6 APA, approximately $2.5 million, was so much higher than the NBLOI's initial sum of $1.2 million.  (*Id.* at 17.)  In Defendants' view, Victaulic provided these funds "in the hope[] and anticipation of consummating a contract for the acquisition of HiTherm's assets" (*id.* at 21), not as an advance that the parties would offset from the purchase price.  Finally, Defendants argue that because Victaulic advanced these funds for the mere possibility of securing a contract, and because Victaulic did not invoice HiTHERM for repayment (and, in at least one instance, rebuked HiTHERM for attempting to make a repayment), Victaulic had no reasonable expectation of repayment.

Victaulic, on the other hand, points to evidence in the record indicating that both parties understood the advances to be loans that HiTHERM would eventually repay.  (Expert Rep. of Steven B. Boyles § VI.B, ECF No. 143-3.)  Such evidence includes Victaulic's request that HiTHERM executives provide a personal note and guaranty for the advances (*id.* ¶ 70),

testimony from a Victaulic executive that the advances would be subtracted from the purchase price (*id.* ¶ 82), emails from a HiTHERM employee indicating that he understood the advances to be loans that HiTHERM would have to repay should the asset purchase fall through (*id.* ¶¶ 86, 88), and invoices from HiTHERM that discounted the cost of raw materials purchased by Victaulic for HiTHERM's benefit (*id.* ¶¶ 95–96).  This evidence clearly creates a genuine issue of material fact as to Defendants' theories that (1) the parties intended the advances to be *added* to the final purchase price, and (2) Victaulic made these advances with the hope to secure an asset purchase agreement and without any reasonable expectation of repayment.  Accordingly, the Court rejects these theories as grounds to enter summary judgment in favor of Defendants.

### ii.      Whether the March 6 APA Precludes Victaulic's Unjust Enrichment Claim

Pennsylvania law provides that "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Deemac Servs.*, 2023 WL 414444, at *7 (quoting *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006))).  This Court, however, held above that genuine disputes of material fact preclude it from ruling on the validity of the March 6 APA.  *See supra* § III.B.  Accordingly, the Court cannot dismiss the unjust enrichment claim on the theory that the March 6 APA governs this issue.  Victaulic may pursue this claim unless the jury finds that the March 6 APA constitutes a valid contract between the parties.  *Deemac Servs.*, 2023 WL 414444, at *7 (denying summary judgment on unjust enrichment claim where the court declined to enter summary judgment on the existence of an underlying contract).

### iii.      Quantifying the Value of the Benefit to HiTHERM

Defendants object to Victaulic's claim that Defendants "benefited from their exposure to enhanced techniques, equipment, partners, vendors, and facilities that Victaulic provided to

HiTHERM" (Compl. ¶ 68), as Pennsylvania law requires an unjust enrichment claimant to quantify the value of the benefit conferred and not simply rely on "'speculative' or 'intangible' benefits," *Salvitti v. Lascelles*, 669 F. Supp. 3d 405, 415 (E.D. Pa. 2023) (quoting *Morlok v. City of Philadelphia*, 2022 WL 252185, at *5 (3d Cir. Jan. 26, 2022)).   Victaulic indeed has not assigned a monetary value to such "exposure," but as the Court ruled previously, Victaulic's unjust enrichment claim has clearly quantified the approximately $1.5 million in advances that it seeks to recover.   Accordingly, the Court finds that Victaulic's claim may proceed to trial as to that amount, but Victaulic, having made no showing as to the value of any "exposure," may not advance that portion of its claim to trial.

## 2.      Money Had and Received

A claim for money had and received "seeks to recover money paid to the defendant by mistake or under compulsion, or where the consideration was insufficient."   *White v. Conestoga Title Ins. Co.*, 53 A.3d 720, 723 n.5 (Pa. 2012).   The voluntary payment doctrine bars recovery on this theory, however, "when the payment was voluntarily made 'with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced.'"   *Behav. Health Indus. News, Inc. v. Mental Health Sys., Inc.*, 2018 WL 2254777, at *4 (M.D. Pa. May 17, 2018) (quoting *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 661 (Pa. 2009)). Defendants argue that Victaulic has failed to establish the elements of this claim and, in any event, are barred from asserting it under the voluntary payment doctrine.[14]

At the motion to dismiss stage, Defendants asserted that Victaulic failed to plead that it paid them "by mistake or under compulsion" and therefore failed to state a claim for money had

---

[14]     Defendants also argue, as they did with the unjust enrichment claim, that the existence of a binding contract—*i.e.*, the March 6 APA—precludes a claim for money had and received.   For the same reasons discussed above, a jury must first decide whether the March 6 APA was a valid contract.

and received.  Victaulic argued in response that Defendants omitted the third possibility—*i.e.*, cases in which "consideration was insufficient"—and that, indeed, "Victaulic's claim is premised on a lack of sufficient consideration . . . ."  (Victaulic's Omnibus Opp. to Defs.' Respective Mots. to Dismiss at 22, ECF No. 46.)  This Court denied Defendants' motion on that basis.  *See Victaulic Co. v. HiTHERM, LLC*, 2022 WL 2953690, at *4 (E.D. Pa. July 26, 2022).  Now, on summary judgment, Defendants argue that there could be no failure of consideration because there was no contract binding the parties when Victaulic advanced the funds (nor would there be such a contract until, in Defendants' view, the parties agreed to the March 6 APA in 2020).  Following the parties' purported agreement to the terms of the March 6 APA, Defendants argue that at that point, they *did* provide consideration when they "partially performed" by having Mr. Sufi send Mr. Webster the formula via email.

First, Defendants miss the mark when they argue that there could not be "insufficient consideration" for Victaulic's cash advances because, at the time Victaulic made the advances, there was no contract between the parties.  Quasi-contractual claims like those for money had and received address that very situation—*i.e.*, one in which no contract exists.  To hold otherwise would paradoxically require the existence of a contract for a quasi-contractual claim, despite that quasi-contractual claims are barred where a contract governs the parties.  Victaulic has established at least some evidence that it provided funds to Defendants and received little to nothing in return—clearly a potential case of insufficient consideration.  Second, even if Mr. Sufi's provision of the formula to Mr. Webster was some amount of consideration for Victaulic's cash advances, Victaulic need only show *insufficient* consideration, not a complete lack thereof.  Accordingly, the Court declines to enter summary judgment in favor of Defendants on these bases.

Turning to the voluntary payment doctrine, the Court agrees with Victaulic that it has provided enough evidence to create a genuine dispute as to whether Victaulic made the advances "with full knowledge" and "without any fraud having been practiced."   *Behav. Health Indus. News*, 2018 WL 2254777, at *4.   Victaulic's expert report and summary judgment briefing discuss at length the potentially problematic accounting practices at HiTHERM, and the Court therefore cannot hold that there is no genuine dispute for trial as to this issue.

### 3.      Accounting

Defendants request summary judgment on Victaulic's accounting claim on the basis that its underlying claims—unjust enrichment and money had and received—are meritless.  Because the Court has declined to enter summary judgment on those claims, however, it likewise does so as to the accounting claim.

## IV.   CONCLUSION

For the foregoing reasons, both parties' Motions are granted in part and denied in part.  A corresponding order accompanies this memorandum.